UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA             CASE NO. 18-cr-00030-01

VERSUS                               CHIEF JUDGE HICKS

DAVID D. DEBERARDINIS (01)           MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

David D. deBerardinis ("Defendant"), a college-educated businessman, was indicted in connection with allegations that he defrauded sophisticated investors of millions of dollars that they invested in a fuel trading business that he touted. Defendant contends that he lacks the mental competency to face those charges at trial. After hearing evidence on the issue, the undersigned finds that Defendant does have the mental capacity and competency to assist in his defense and stand trial. For the reasons that follow, it is recommended that the court adopt that finding.

**Relevant Facts**

**A. Introduction**

Defendant, born in 1961, is charged with multiple counts of mail fraud, false statement to a bank, and money laundering. The charges arise out of an alleged Ponzi scheme, orchestrated by Defendant, to defraud investors and two federally insured banks. Defendant led investors to believe that his company, Financial Resources, was able to buy fuel from Alon, USA, Inc., an Israeli company, and then resell the fuel to Freeport-

McMoran.  Defendant represented that he had personal relationships with certain principals at Alon, which allowed him to earn a virtually guaranteed profit from the fuel trading arrangement.

The competency issue was first presented when defense counsel filed a Motion to Determine Competency (Doc. 66).  The motion represented that a preliminary report from a physician indicated that Defendant may not be competent.  The court directed Defendant to report to a Bureau of Prisons ("BOP") facility for evaluation.  Defendant was also examined by his own healthcare professionals.  A competency hearing was held on December 19 and 20, 2019.  The court received evidence and heard testimony from a BOP psychologist and three experts retained by Defendant.

**B. The Haney Report**

Defense counsel represent that Defendant maintains to this day—despite abundant evidence to the contrary— that he had a fuel trading relationship with Alon and a personal relationship of many years with Albert Saiah, who he says is Alon's principal owner. Defendant shared details of those alleged relationships with some investors.  He told his lawyers the same stories.   The lawyers hired private investigator Keith Haney to accompany Defendant to Memphis and attempt to verify the facts about Alon and Saiah. None of them panned out.  Counsel urge that this is evidence that Defendant suffers from a mental condition that makes him believe his tales are true.

Investigator Haney's report was submitted as evidence at the hearing.  Defense Ex. 4.  According to the report, Defendant told Haney that he met Albert Saiah in about 2006 when he drove to Saiah's house in a gated Memphis community to clear up an issue over

a $500,000 check.  He was stopped by guards at a gatehouse, who required he wait until after 6:00 to enter because it was the Sabbath and Mr. Saiah would not meet with someone until it ended. Defendant said he waited and eventually able to meet with Saiah in his large house, which had a swimming pool out front. Defendant told Haney that he visited the home many times between 2012 and 2016.

Haney and Defendant drove to the address on Harbor Bend Road in Memphis where Defendant said Saiah lived.  There was a home there, but it was not gated or otherwise as Defendant described.  Defendant said the complex must have been renovated, Saiah's house torn down, the guard shack and gates removed, and the swimming pool replaced with a stream and the mature trees that were there that day.

Haney checked the property records and spoke to the current owner of the house. He learned that the house was built in 1996 and sold to the current owners in 2006. Neither the owner nor a maid (who had worked at the house since the 1990s) had ever heard of an Albert Saiah or David deBerardinis. The maid confirmed that there was never a pool or security gate.

Defendant told Haney that a certain driver, Willie, had driven him to the home many times and could confirm his visits there and to other places in Memphis where Defendant claimed to have conducted business.  But when Willie was coming to meet with Haney, Defendant did not want to stick around.  Willie told Haney that he was fond of Defendant, and he had records of driving Defendant on 13 trips. None of them were to the house on Harbor Bend Road.

Defendant also described to Haney how he would meet with Saiah and other "big Jews" at the River Inn on Mud Island. He said the men were owners of the hotel and had two private meeting rooms that were not available to the public. Defendant pointed Haney to a man in the hotel who Defendant said was the manager. Defendant said the man would be very familiar with Saiah, the other owners, and Defendant himself. Haney later spoke to the man, who had been the manager since 2003. He had never heard of Defendant, Saiah, or the other men Defendant said were involved. The hotel had two penthouses available for rent, but no private rooms.

Defendant hired a makeup/costume artist to make him look like an older Hassidic Jewish man. The Government alleges that he was trying to pass himself off as Albert Saiah to further his scheme. Defendant says it was done for an "Albert Saiah party," and Willie drove him in-costume from the hotel to Saiah's house for the party. Willie told Haney that he never saw Defendant in any costume or wearing makeup, and he did not recognize a photo of Defendant in the costume.

Defendant had pointed Haney to a building at Fed Ex where he said Willie would drop him off to negotiate fuel deals. Willie said he had never been to that location and would remember if he had. The head of Fed Ex security said there had not been fuel in that area since September 11, 2001. The fuel farm had been moved to another location, and the entrance that Defendant claimed to have used was converted to Level 1 security access because it was near the airport tarmac. He said any claim by Defendant that he was allowed in or negotiated a fuel deal there was mistaken.

Page 4 of 36

Defendant had also pointed Haney to what he said were Valero fuel storage tanks that Alon used. Haney learned that some of the tanks held molasses and yeast for a brewery, and another was used by DuPont to store ammonia. Neither Valero nor fuel tanks were in the area. Defendant had identified for Haney a building that he said housed the Alon computer center or "romper room." Haney found it was empty, and records showed it had been a music store until it closed in 2018. Haney was also unable to confirm other claims Defendant made about his activities in Memphis.

### C. Dr. George Woods; Initial Report

Defendant's Motion to Determine Competency (Doc. 66) asserted that psychiatrist Dr. George Woods made a preliminary determination that Defendant "may currently not be competent to stand trial." Dr. Woods opined that Defendant is unable "to engage with his legal team in a meaningful way and to participate in the complex conversations that are necessary for his legal defense." Dr. Woods spent several hours evaluating Defendant and asserted that Defendant would require significant additional testing to fully determine the extent of his impairments.

### D. Dr. Robert Ouaou

The defense presented Dr. Robert Ouaou, who has a Ph.D. in clinical psychology with a specialization in neuropsychology. He has treated or assessed early dementia patients in his private practice, and he performs about 100 evaluations per year. He has testified as an expert nearly 150 times. The court accepted Dr. Ouaou as an expert in clinical, neurological, and forensic psychology. His CV is Defense Exhibit 73, and his report is Exhibit 49.

Dr. Ouaou conducted several hours of neuropsychological assessment and psychiatric interviews with Defendant over two days. His report stated that Defendant suffered from conversational difficulties and "exhibited delusions of grandiosity." He testified that Defendant said more than he could keep up with, and he often told implausible tales about himself. Dr. Ouaou said, "I heard a lot of stories from him," but Ouaou tried to focus on the testing.

Dr. Ouaou reported that Defendant provided a history that was "inaccurate, distorted, and/or implausible." Specifically, Defendant maintained that he had a personal, complicated, and detailed relationship with Albert Saiah (a man who defense counsel told Dr. Ouaou does not exist). Dr. Ouaou reviewed investigator Haney's report the day before the hearing and talked to Defendant about it. Defendant insisted to Ouaou that he did do business with Albert Saiah.

Dr. Ouaou opined that Saiah is a confabulation[1] caused by neurodegeneration, which takes place slowly over time. He does not think Defendant is voluntarily trying to mislead counsel, but he does not know the underlying reason Defendant created Saiah. The court asked: "Is it possible this man was created out of thin air for the purpose of defrauding other people, and now the gig's up, so to speak, and he's not letting go of that?" Dr. Ouaou responded: "The easy answer is yes. But you have a psychologist from the Government and myself evaluating him for his sense of character, especially the Government, and there

---

[1] Confabulation is a symptom of memory disorders in which made-up stories fill in memory gaps with erroneous information. It is usually less elaborate than a delusion, but the terms overlap.

is no indication that he was someone that had a propensity to do such a thing. But the possibility is there." On cross-examination, Dr. Ouaou was reminded that Defendant is charged with falsifying bank statements, forging an $80 million check, creating fake websites for businesses, creating bogus emails, and other acts that could indicate a propensity to lie about Albert Saiah and a fraudulent investment scheme.

Defense counsel asked if it was possible that Defendant had originally created Saiah for an illegal and fraudulent purpose, but he now "either confabulates or by delusion actually believes that the story that he once told is really true." Dr. Ouaou said, "It's possible, I would believe; I'm not sure. I'd have to really get into it with him (in a clinical interview) about that."

Dr. Ouaou reported that Defendant has frank anosognosia, which occurs when a person has no insight into his illness and does not perceive himself to have an illness. He wrote that Defendant had significant deficits in cognitive functions, particularly processing speed and working memory, and in executive functions, which are responsible for insight into and control of behavior.

Dr. Ouaou administered multiple measures to test for malingering, and none was found. Defendant did exhibit perseveration, meaning he would get stuck on an idea even if corrected. Dr. Ouaou said it could just be stubbornness, but he thinks the results of other tests would have been lower if that were the case.

He administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). There was an indication that Defendant had an IQ of 114 when he was younger. But according to the test administered at age 57, Defendant's Full Scale IQ was only 89 (23rd

percentile; low average). Defendant scored in the low average range (23rd percentile) for ability to attend to information and briefly hold it in memory.  He scored in the borderline range (8th percentile) on performance in the Processing Speed Index, which measures the ability to quickly process visual-motor information.  It is related to the ability to pay attention, use short-term memory, and follow information intelligently.  Dr. Ouaou said at the hearing that the score itself was not evidence of neurocognitive declines, but it was a red flag.  He conceded on cross-examination that processing speed is less of an issue when a person is given accommodations such as time to consult with a lawyer as needed.

Dr. Ouaou attributed Defendant's impairments to "acquired central nervous system damage," and noted that Defendant "exhibited a host of cognitive defects that are normally found in patients with central nervous system damage or disease."  He opined that Defendant "unequivocally has a serious psychiatric illness with psychotic features, characterized by delusions of grandiosity."  His opinion is bipolar disorder with psychotic features; cognitive deficits. Dr. Ouaou asserted that Defendant's mental disease "significantly interferes with his ability to properly assist his own defense."

Dr. Ouaou explained that dementia is an overarching term that includes Alzheimer's disease and many kinds of dementia, including frontal temporal lobe problems.  His testing of Defendant showed a general decline in functioning related to the frontal lobe of the brain.  The frontal lobe is the last area of the brain to develop.  It is the seat of reasoning, forethought, and advanced reasoning.  Many psychological disorders are localized there. Defendant had a pattern of performance impairments on tests related to frontal lobe function.  The Wisconsin Card Sorting Test stood out in that regard.  The test should not

be hard for a person of Defendant's intelligence, but he did poorly despite good effort. This really stood out to Ouaou as indicating frontal lobe issues.

Dr. Ouaou admitted that a person can have cognitive decline and still be competent. He does not dispute that Defendant knows his legal rights and understands the roles of the players in court. And he admitted that a competent defendant can make bad decisions about trial strategy. On the other hand, he said that a person could remember events from the past but still suffer from a mental health disorder that could result in confabulations or delusions.

Dr. Ouaou has performed about 180 competency evaluations. But he did not administer the standard competency test in this case *because he was not asked to*. He said he "was asked to evaluate his neurocognitive function, not necessarily a complete comprehensive competency evaluation." He could not recall specific examples of Defendant exhibiting memory-related issues during their discussions.

### E. Dr. Erin Bigler

Erin David Bigler, Ph.D. is a recently retired BYU professor who now works as an adjunct faculty member at the University of Utah. He earned his Ph.D. in 1974 and, during a fellowship in Phoenix, he helped develop the first imaging lab in the Southwest. He began his academic career at the University of Texas in 1977 and developed their first clinical neuropsychology assessment lab. He moved on to BYU in 1990. He was accepted as an expert in the field of neuroscience and interpreting magnetic resonance imaging (MRI) and brain scans, which he said he had been doing for his entire career.

Dr. Bigler reviewed MRI scans of Defendant's brain that were performed using a Tesla 1.5 machine.   He said that the Tesla 3.0 is newer equipment that would be expected to show more definition, but it was not available in Shreveport without a specific referral and a long wait. Dr. Bigler reported that Defendant has structural brain abnormalities consistent with Dr. Woods' and Dr. Ouaou's findings.   Exhibit 46 includes the scans, Exhibit 50 is Bigler's report, Exhibit 54 is the scan protocol, and Exhibits 60-69 are other materials generated by Dr. Bigler.

Dr. Bigler explained, "White matter are the connections in the brain. They're the telephone cables that connect one area with another area." It is like a network, and a patient will have cognitive problems if it deteriorates.  He saw on the scans an area of white matter hyperintensity ("WMH") and an increased level of WMH surrounding Defendant's lateral ventricles, greater than would be expected in a person his age.  Ideally, there would be no WMH.  "You don't want WMH in your brain."  Dr. Bigler could not put a percentile on where Defendant's amount of WMH would rank within the population.

Dr. Bigler stated that his findings were significant because "[w]hite matter pathology can be associated with reduced speed of processing, deficits in memory and executive functioning deficits as well as abnormal emotional functioning."   Multiple factors may give rise to its occurrence, including alcohol, substance abuse, hypertension (especially over age 50), stress, or injury.  Defendant's areas of WMH would impact communication between different lobes of the brain, but the brain can sometimes compensate by using other routes of communication.  The patient cannot get rid of the condition, but good cardiovascular health can arrest problems.

Dr. Bigler was asked if the presence of WMH means Defendant is not competent. He said he could not say based on scans alone; they do not mean much without clinical correlation with what the patient is experiencing. He noted that the presence of WMH is more common in individuals with bipolar disorder. There is a correlation, not necessarily a causation, between WMH and bipolar disorder. WMH also falls under the umbrella of microvascular disease. Defendants' scans are "suspicious for" microvascular disease because of his history of hypertension but do not equal a diagnosis. He said there "can be" a link between WMH and delusions. With respect to Korsakoff's syndrome, which was discussed by the other experts, Dr. Bigler said it can lead to confabulation and memory impairment.

Dr. Bigler never met Defendant and did not administer a competency evaluation, although he can and has performed such evaluations on others. He explained that his opinions in his report were "preliminary" in the sense of what it means for the patient. There could be other information that would add to the WMH to reach a final assessment. He would need more scans, taken 6-18 months after the first set of scans, to assess the rate of neurodegeneration.

**F. Dr. George Woods; Follow-up Report and Testimony**

Dr. George Woods is a neuropsychiatrist and was accepted as an expert in the field. His curriculum vitae (Defense Exhibit 73) reflects extensive teaching and writing throughout his career. His report is found at Exhibit 51. Dr. Woods charges $550 per hour and has billed about 40 hours on this matter. He testified that his time includes about 18

hours of clinical interviews with Defendant over the course of three days, plus a couple of phone calls.

Dr. Woods prepared a follow-up report (Exhibit 44) in light of the reports from Dr. Ouaou and Dr. Bigler. Dr. Woods found that the testing done by Dr. Ouaou and the imaging done by Dr. Bigler were consistent with his own findings. Dr. Woods opined, to a reasonable degree of medical certainty, that Defendant suffers from temporal and frontal lobe deterioration, leading to deficits in memory, problem solving, and accurate reporting. He described the condition as Korsakoff's psychosis or syndrome, which is often caused by a lack of vitamin B-1 in the brain and can also be an alcohol-related brain disorder. Its primary deficit is inaccurate reporting and the belief in those reports, even in the face of overwhelming evidence to the contrary.

Dr. Woods also concluded that Defendant suffers from longstanding neurological deterioration of his frontal and temporal lobes, a condition that is not related to Korsakoff's syndrome but is synergistic with it, creating more severe and atypical behavioral presentations. He wrote that bipolar disorder "must be considered" given Defendant's pressured speech, flight of ideas, grandiose delusions, and family history of mood-related symptoms. Dr. Woods stated that this combination renders Defendant "unable to rationally assist his attorney in the preparation of his defense." Dr. Woods testified at the hearing that it is his opinion that Defendant was not competent when he measured him. Defendant may be able to do a number of things, but his issues "would impair his ability to consistently work with his attorneys."

At the hearing, Dr. Woods described the meetings and tests that led to his report. He met with Defendant and defense team in early 2019.  He and Defendant talked for about five hours one morning, then went to lunch.  Defendant had a drink during lunch and continued to drink for the rest of the afternoon.  This had not been a planned part of the evaluation, but it became part of it in a sense.  He described Defendant as a "garbage can user" of alcohol and other substances.  Alcohol and amphetamines, he said, are the only drugs that directly affect the temporal lobe.

Dr. Woods observed spider nevi on Defendant's nose, which is consistent with stage four alcoholism but can also be caused by high blood pressure.  Microvascular disease can affect the brain but can be seen in other small blood vessels such as those on the nose and ear.  Dr. Woods said that lifestyle changes can turn around cardiovascular disease, but they cannot heal dementia

Dr. Woods said some symptoms—core symptoms of mood disorder or bipolar disorder—immediately jumped out to him.  He observed classic flight of ideas (which requires redirection, unlike tangential thinking for which the subject will come back on topic on his own) and pressured speech that requires the subject to be interrupted or redirected.  Woods watched Defendant talk to the lawyers.  He would tell stories, walk around, deflect redirection, and left at least once.  The stories included examples of grandiosity.

Confabulation was also discussed at the hearing.  Dr. Woods mentioned the Albert Saiah stories.  He also described a trip to Dallas with the defense team to meet someone who Defendant said could resolve all this.  The person never showed for the meeting.

Defendant claimed that the person's secretary had walked by while they were waiting and said nothing, which indicated the person must not have wanted to get involved. Defendant also told unlikely stories about things such as cars and the quantity of drugs he had used (e.g., $30,000 worth in a week). Dr. Woods mentioned something to Defendant about a neighbor he had in Nebraska when growing up. Then "out of nowhere" Defendant claimed that he knew members of the family who lived in Texas, had a relative married to them, had flown to Midland in a small plane to visit them, that the family had a 727, and so on. Dr. Woods did not say whether he believed that story was true, but he implied that it was an incident of confabulation.

Dr. Woods viewed Defendant's IQ decline as significant. Defendant took the Ray Complex Figure Test, which requires a subject to draw something, then redraw it later. It tests for the ability to get the big picture and respond in an effective way. Defendant was in the 7th percentile. Dr. Woods said that Defendant has significant impairments in the very areas where the brain scans say there is a problem. But he allowed that neuroimaging that shows white matter issues does not always translate to clinical pathology. To explain, Dr. Woods said that he does not order scans in patients over 75 unless he is looking for something specific because scans in persons that old will look terrible, but the person may be a high functioning professional.

Dr. Browning, whose testimony is discussed below, said that it was unlikely Defendant had Korsakoff's syndrome because it is rare and preceded by Wernicke encephalopathy, which is an acute brain reaction to severe lack of thiamine (vitamin B1). Dr. Woods disagreed with Dr. Browning that Korsakoff is always preceded by

encephalopathy.  He said that there are seven kinds of Korsakoff, and not all require vitamin deficiency.  And the condition may be rare in the general population, but about 18% of people who drink daily for several years get it.  He said that some persons with the condition may exhibit provoked confabulations, where they make things up in response to a question such as "Did you fight in the war?"  Others come up with tales out of whole cloth, unprovoked by a question.  Some may do both.

### G. Dr. Sam Browning

At the request of the Government, Defendant was ordered to report to the Federal Medical Center in Fort Worth, Texas for a competency evaluation.  He was examined there by Sam Browning, Ph.D.  His report is Gov. Exhibit 1.  Dr. Browning earned his Ph.D. in clinical psychology in 2013.  He worked for BOP for about four years as a staff psychologist, then became a forensic psychologist in January 2017.  He explained that forensic psychologist is a title based on job duties, not an indication of a certificate or particular license.  He has performed over 100 competency evaluations, more than 30 sanity evaluations, and he has testified as an expert about 15 times.  He found 22% of those he evaluated to lack competence, which is in line with general statistics of 80/20. Dr. Browning said he was not an expert on brain scans or MRI assessment, and neuropsychology is an additional specialization that he does not have.  The court accepted Dr. Browning as an expert in forensic psychology.

Defendant was with Dr. Browning at Fort Worth from August 14 to 26, 2019.  A forensic examination was administered on intake.  Gov. Exhibit 3.  Defendant said that he had been charged with "stealing $100 million" and denied any mental health history.  He

later added that he was in a car accident in 2016, lost consciousness for less than 24 hours, and later suffered memory deficits but not any other symptoms.

Dr. Browning was able to observe Defendant interact with staff and inmates without Defendant knowing. He was able to review Defendant's phone calls and emails. He conducted three or four interviews of about six hours total, plus there were two or three hours of testing time. Dr. Browning administered numerous tests, conducted interviews with correctional staff and attorneys involved in Defendant's criminal case, and reviewed relevant records. Those records included reports by Dr. Woods, Dr. Ouaou, and Dr. Bigler.

Defendant told Dr. Browning that he was born in 1961 and reared primarily in Shreveport. His parents separated when he was six years old, and his mother married his stepfather when he was 10 or 11 years old. Defendant described his biological father as physically abusive, and he said he had a somewhat distant relationship with both his biological father and his stepfather.

Defendant said he earned poor to average grades in school, and he "flunked out" after one semester at LSU. During his time at LSU, he started a laundry business cleaning clothes for other college students and turned a profit. He returned to Shreveport and attended Centenary College, where he earned a bachelor's degree in business administration with a GPA of 2.29. He later worked in life insurance and started several other businesses. Defendant told Dr. Browning that he started a merchant bank, but defense counsel stated in a post-hearing memorandum (Doc. 112, pg. 36) that Defendant was never involved in a merchant bank as a founder, employee, or otherwise. Counsel contends that the claim is a grandiose and false boast.

Defendant told Dr. Browning that he got into fuel sales and distribution in about 1999.  He took a brief hiatus from the field, but he got back in it in 2008 and ran a business in the fuel industry until his arrest.  He described his role in the company as to oversee operations, manage staff, and liaise with other business partners to grow the business. Defendant recounted for Dr. Browning a story about how, in the early days of his business, he spent several hours talking to truck drivers about their perception of logistics and distribution issues.

Defendant acknowledged a history of use of alcohol and drugs.  He began drinking alcohol at age 15, only occasionally at the time, but his consumption increased until he was drinking on a daily basis in college.  He would refrain from drinking if he had something important to do on a particular day.  He began using cocaine in college but quit in 2009 after he was arrested for possession of 0.5 grams.  He experimented with some other drugs during college, including pain medication, marijuana, mushrooms, and LSD.  Defendant said that, near the time of his arrest, he was drinking daily and abusing prescriptions for pain medications, amphetamines, and Ambien.

Defendant reported that he is married and has two children.  His criminal history includes arrests for drug possession, DWI, reckless operation of a vehicle, and the like. Some of the charges were dismissed and did not result in convictions.

Dr. Browning noted that, throughout the evaluation period, Defendant was courteous but made comments that were mildly inappropriate to the context of the interview.  He was, however, receptive to redirection.  Defendant was alert and oriented and his attention and concentration appeared intact.  Dr. Browning reported that Defendant

did not present with pressured speech, sexual preoccupation, elevated/expansive mood, or flight of ideas that would be symptomatic of bipolar disorder or a related illness. This is at odds with the findings of Dr. Woods.

Defendant did not report any family history of mood disorders, which Dr. Browning testified was notable because bipolar and other mood disorders are often at higher rates within an immediate family. Defendant denied major symptoms of mood disorder or mental illness. He had mild depression symptoms related to being incarcerated. He took no medications for mental health and had never been referred for psychiatric treatment. His affect was euthymic (normal), but he was irritable at times about being in jail. He was cooperative and followed rules. He had good hygiene, which is often not the case for those who are depressed or have mood disorders. He did not exhibit hallucinations or hear voices. His speech was normal in rhythm and tone but at times fast. He would go off on tangents at times but could be redirected. He could recall the history of his fuel business for years back, and he showed good remote and short-term memory. Defendant did not answer all questions. He said some were insensitive or irrelevant, for example, sexual abuse history. On others, he said he wanted to consult counsel before answering.

Defendant was administered the Validity Indicator Profile (VIP), a 45-minute test, to assess his effort and screen for evidence of malingering. His results from the verbal and nonverbal sections reflected valid and compliant response styles, indicating that he provided appropriate effort. There was no indication of malingering. Defendant's pattern of results suggested estimated nonverbal functioning in the average to high average range and estimated verbal functioning in at least the low average to average range.

Dr. Browning did not administer cognitive functioning assessments because Defendant had recently undergone a neuropsychological evaluation with Dr. Ouaou. Dr. Browning stated that results are unlikely to change significantly within such a short period of time, and re-administration of such measures would be likely to result in "practice effects," which would artificially inflate Defendant's performance.

Instead, Dr. Browning discussed findings from Dr. Ouaou's report. Dr. Browning concluded that the results of Defendant's neuropsychological evaluation indicate a "significant decline in cognitive functioning from his baseline across several domains." However, Dr. Browning noted that Defendant's performance in nearly all domains remained in the low average to average range, or higher. Dr. Browning wrote that Defendant "is able to perform abstract reasoning, learn new information, recall previously learned information, provide appropriate attention, conduct mental manipulation, and switch mental sets."

To assess Defendant's level of personality and emotional functioning, Dr. Browning administered the Personality Assessment Inventory (PAI). It is a 60 to 90-minute test that looks for psychological disorders or symptoms, including bipolar or schizophrenia, for which there have been no prior tests. Defendant's responses were consistent, and his results were considered a valid reflection of his personality and emotional/psychological functioning. His responses indicated an interpersonal style characterized as self-assured, confident, and dominant. There was no evidence of bipolar, mania, mood disorder, or delusional thinking. There were indications of substance abuse, stress, worry, and insomnia.

In addition to clinical interviews and behavioral observations, Dr. Browning administered the Evaluation of Competence to Stand Trial-Revised (ECST-R) to determine whether Defendant is competent to stand trial. *None of the defense experts administered this commonly used test.* Defendant displayed sufficient factual understanding of the legal proceedings. For example, he was able to discuss his charges with average understanding, and he expressed an understanding of the seriousness of the charges. He also provided a discussion of the events that had occurred in the proceedings and described the basic roles of the judge, jury, defense counsel, and prosecution. For example, when asked about the role of the jury, he said, "They decide your fate … based on the facts as presented and as they understand them." Defendant described the role of defense counsel as: "The defense attorney, lead, stands up in court, assimilates defensive information as best he can, and uses it to defend the client as best he can. He presents the case in the best light and minimizes the criminal implication." Defendant was able to discuss the risks associated with speaking to a prosecutor without his attorney present, and he discussed his intent to discuss with his attorney whether he would testify. Dr. Browning noted that Defendant's "report of the alleged offense was notable for its correspondence to records detailing the alleged facts and circumstances in this matter."

Defendant also provided evidence of sufficient rational understanding of the legal proceedings. He described realistic thought processes regarding possible outcomes, articulated an understanding of plea bargains, and evinced trust in his attorney's judgment. He did not demonstrate any overt difficulties regarding his ability to properly assist counsel and was able to offer an adequate understanding of counsel's expectations of him. His

description of the process of resolving disagreements with counsel "was not remarkable for psychotic thinking and/or a self-defeating motivation." Defendant described a process used to address differences of opinion with his attorney that involved talking with his attorney, expressing concerns, and often acquiescing to his attorney's recommendations. They were able to settle most disagreements by discussion. Dr. Browning noted at the hearing that Defendant signed an affidavit in support of a request to waive his presence at the hearing; that implied that Defendant can understand his legal rights and can work with his attorney regarding court issues.

Dr. Browning discussed the concerns noted by Dr. Ouaou that Defendant was suffering from a possible grandiose delusion related to Albert Saiah. Dr. Browning wrote that while Defendant's discussions of his interactions with Saiah could possibly represent a grandiose delusion, another explanation is that Defendant created the identity of Saiah in conjunction with his alleged offense behavior in an attempt to defraud individuals and/or institutions. Dr. Browning noted that clinical interviews with Defendant, correspondence with defense counsel, and other sources were "unable to provide any other specific evidence of delusional thinking, perceptual disturbance, or other psychotic symptoms." Accordingly, Dr. Browning found that there was insufficient evidence to support the presence of a delusion.

Dr. Browning diagnosed Defendant with Mild Neurocognitive Disorder, Moderate Alcohol Use Disorder (in early remission), and Moderate Cocaine Use Disorder (in sustained remission). He stated that, while Defendant appeared to experience a decline in several domains of cognitive functioning, his original levels of functioning were estimated

to be in the high average range, so even with declines his current levels of cognitive and adaptive functioning fall within the low average to average range. Significantly, Dr. Browning found that Defendant's reduction in cognitive functioning "does not appear to impair his ability to communicate, advocate for himself, or understand the nature of his legal concerns." And there was insufficient evidence, Dr. Browning found, "to suggest he suffers from a major mood disorder, psychotic illness, or other psychiatric condition at this time."

Dr. Browning said at the hearing that his diagnosis of mild neurocognitive disorder was based on Dr. Ouaou's test, which showed a decrease in IQ over the years. He said that a big drop in IQ, especially for someone of Defendant's age and education, is usually caused by traumatic brain injury, which could be due to stroke, drugs, physical trauma, or other cause. His diagnosis included "multiple etiology" because there was evidence of substance abuse over time plus a car accident and two sailing accidents that resulted in bumps on the head. In further support of his diagnosis, Dr. Browning noted that Defendant was able to perform the functions of daily living while at Fort Worth with no need for assistance.

He also observed that Defendant talked to his wife on the phone and was able to accurately relay information to her on the competency evaluation/restoration process. Defendant also discussed with his wife logistics for his release and return home, and he spoke with a private investigator (although defense counsel discounts that conversation as merely being about putting money in his inmate account). Dr. Browning wrote in his report

that Defendant, during the calls, "was able to recall names, events, and people from both his recent and remote history."

Dr. Browning concluded that Defendant does not suffer from a mental disease or defect that would render him unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense. Thus, Defendant was competent to stand trial. His abilities have declined, but from a pretty high level to low-average. Defendant's rate of decline is not predictable, and the rate is not clear from the evidence on hand.

Korsakoff's syndrome, diagnosed by Dr. Woods, was discussed with Dr. Browning. He said that it is a rare disorder that causes major memory issues/deficits, but Defendant had average memory in multiple domains. Dr. Browning also said that Wernicke's encephalopathy often precedes Korsakoff's. After it resolves, about 80% of people will get Korsakoff's, with the other 20% not having clinically relevant symptoms. Dr. Browning saw no evidence that Defendant was treated for Wernicke's encephalopathy. There was "insufficient information" for him to diagnose Korsakoff's in this situation. He said that it is very unlikely that rare symptoms related to a rare disorder resulted in a multimillion-dollar, multi-victim fraud using an invented person initially created with fraudulent intent.

Dr. Browning allowed that Defendant displayed high confidence and borderline grandiosity. But he said the only example of delusion or grandiosity that he saw were related to the claims about Albert Saiah being real. Defense counsel examined Dr. Browning about potential examples of a greater degree of grandiosity and other examples,

such as Defendant's reported history of businesses and unverified claim that other inmates looked up to him and asked for financial advice.  He also asked about Defendant's offer, mentioned in Dr. Browning's report, to introduce Dr. Browning to someone who could help him with his career.  Dr. Browning said the discussion was inappropriate.  Counsel suggested it could be evidence of grandiosity, but Dr. Browning said it could just be how Defendant was used to operating in the outside world.

Confabulation and delusion were also discussed at the hearing.  Dr. Browning said that confabulation is a symptom of memory disorders in which made-up stories fill in memory gaps with erroneous information.  It is usually less elaborate than a delusion, but the terms overlap, and it is debatable where confabulation goes to delusion.  Dr. Browning thought it was unlikely that Albert Saiah is the product of either.

Defendant had created rather extensive documents to support the Saiah story, which indicates deceit rather than delusion.  Dr. Browning said that a person who is delusional does not have to create evidence to support the matter; he firmly believes that it has happened and that there is evidence there if only others will see it.  He was asked how he would "describe the characteristic of profiting off the delusion as in this case."  He answered, "I would categorize that as exceptionally rare if I've ever seen it -- I have never seen that."  Dr. Browning said that he could not know if maintaining that Saiah is real is not a result of a mental disorder, but he said there was insufficient evidence for him to find that Saiah is the result of a mental disorder.

Defense counsel asked whether Defendant could have created Saiah as part of a fraud, later suffered mental decline, and then confabulated Saiah (so that he now believes

his fraudulent creation is real).  Dr. Browning said this was possible but highly unlikely. He said, "People who have a delusion do not typically manufacture evidence to substantiate that delusion's merits to others, because for them, it's obvious on its face and the evidence is there to find and therefore why bother to manufacture evidence, it's already there."  They do not see the need to forge documents and wear elaborate disguises to convince others that something is real.

### H. Hemp Farm Letter

The Government admitted Exhibit 5, which is an email from Defendant to a probation officer about his potential role in operating a hemp farm.  The email indicates that the writer was able to explain complex business matters in great detail.  The defense contends that Defendant's wife actually wrote the email, and there is some support for that being the case.  Given the letter's doubtful provenance, the court does not consider it helpful to assessing competency.

### I. Lay Witnesses

Defendant's witness list for the hearing included lay witnesses who are alleged victims of Defendant's scheme or otherwise had dealings with him in recent years.  It was agreed at the hearing that Defendant would submit excerpts of deposition testimony (from civil suits) or other transcripts in lieu of having the witnesses testify. The Government raised a relevance objection because, generally, those persons' dealings with Defendant took place several months or years ago, and the assessment of competency is based on a defendant's present condition. Defendant responded that the testimony of the witnesses gives a glimpse into his condition at a time contemporaneous with some of the

Government's evidence that it points to in an effort to demonstrate his competency. The court allowed Defendant to file relevant excerpts and said that "they will be considered only to the extent Defendant refers to them in his post-hearing memorandum." Docs. 107 & 108. The examples that were included in the memorandum are summarized below.

Byrum Teekel described how Defendant told an elaborate tale based on Albert Saiah and others, who are real people who can be found mentioned in Israeli newspaper articles. (They just had nothing to do with Defendant or fuel trades with him.) Part of Defendant's plot involved the presentation of an $80 million check. Teekel said he "knew" it was bogus because no one writes a check of that enormity on the First Tennessee Bank. He also said that, as a pilot, he was highly skeptical of Defendant's claim that the head of Alon (a famous Israeli fighter pilot) was flying in for a party and landing his plane at Barksdale Air Force Base. Teekel explained, "Nobody lands at Barksdale field … They got the bomb out there, man."

Mr. Teekel was shown an email sent by Defendant and asked what it meant. "Well, that's a bunch of gobble – typical of him. It's a bunch of good gobbledygook." He said he never attempted to understand what Defendant was saying because " you'd have to had been involved on a day to day basis to know all this" and "I had no – what he's talking about half the time." But he also said that while Defendant "always had a good story" he "seemed to be -- make sense." He was a "great yarn spinner" who "had good stories."

Gray Teekel said in a deposition that Defendant was not particularly skillful in expressing himself in an email and tended to ramble from time to time. Jerry Webb agreed that some of Defendant's emails looked nonsensical. One example was an email that said:

"The foul balls we are playing with on all of the big investment dollars and their sharks have been informative as to what is ahead of us, and at the same time, pushed the deadlines for investment to a point that we have been working throughout the holidays and opened our eyes to real savings and opportunities for us."

Jerry Webb and his son were also on a recorded phone call with Defendant after the $80 million check "bounced." Defendant did a lot of fast talking about his fed account, bond cash, trade platforms and the like. After Defendant got off the line, Jerry said, "What the f*** is going on? I think he's gone crazy, son."

**J. FBI Interviews**

Defendant's proposed Exhibit 71 is a memo prepared by a defense paralegal who reviewed FBI form 302 reports made available for viewing (but not copying) in discovery. The court declined to admit the memo at the hearing. The defense moved to reconsider, and the court responded that the exhibit would be considered and given the weight it is due.

The memo contains brief summaries of FBI interviews of persons who know Defendant. Several witnesses said that they witnessed Defendant use cocaine, marijuana Lortab, or other drugs. Other witnesses commented on their interactions with Defendant. Ross Barrett (investor and business associate) told the FBI that Defendant told him about Albert Saiah, and the story made no sense to him. Raymond Camus (investor) said that Defendant's mind was "like a minnow bucket" in that it was difficult to follow his train of thought. Linda Cupples (investor) said "you could listen to David deBerardinis talk and you could not understand what he said." Ronald Lepow (investor) reported that Defendant is a poor communicator and that it was difficult to understand his business proposal.

Peetrus Booysen (business associate and employee), told the FBI that Defendant must have had help orchestrating his scheme because he lacked the technical expertise and attention span to do it by himself. Similarly, Tara Lockwood, Defendant's former secretary, told the FBI that Defendant had a hard time composing an email and was not smart enough to orchestrate, by himself, a scam like the one the Government alleges.

**Analysis**

### A. Applicable Law

The Constitution "does not permit trial of an individual who lacks 'mental competency.'" Indiana v. Edwards, 554 U.S. 164, 170 (2008). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975); see also Dusky v. United States, 362 U.S. 402 (1960) ("the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.") (internal quotation marks omitted) and United States v. Fields, 761 F.3d 443, 467 (5th Cir. 2014).

Those constitutional standards are implemented by 18 U.S.C.A. § 4241. It allows the defendant to file a motion for a hearing to determine his mental competency. The court shall grant the motion if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings

against him or to assist properly in his defense.  18 U.S.C. § 4241(a).  Defendant filed such a motion, it was granted, and a hearing was held.

"If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General" for an effort to restore his competency. 18 U.S.C. § 4241(b).

Not all courts agree on who has the burden of proof.  Wright & Miller, 1A Federal Practice & Procedure Criminal, Determination of Mental Competency, § 209 fn. 54-56 (5th ed.).  The Fifth Circuit's view is that "[t]here is no question that in federal prosecutions, the government bears the burden of proving the defendant's competence to stand trial by a preponderance of the evidence."  Lowenfield v. Phelps, 817 F.2d 285, 294 (5th Cir. 1987), aff'd, 484 U.S. 231 (1988).  "Once the defendant's competency has been called into question, the burden is on the prosecution to show by a preponderance of the evidence that the defendant is competent to stand trial."  United States v. Moghaddam, 299 Fed. Appx 418, 419 (5th Cir. 2008), citing United States v. Makris, 535 F.2d 899, 906 (5th Cir. 1976).

## B. Findings and Conclusion

There is persuasive evidence that Defendant suffers from mild to moderate cognitive decline, whether due to alcohol, physical trauma, drugs, or other cause.  The brain scans indicate that he has areas of WMH consistent with such decline. He exhibits a boastful and grandiose personality, and he sometimes acts in socially inappropriate ways.  His IQ has

declined over the years, but it remains at a functional level. The Wechsler scale is typically divided into categories, with the "average" category ranging from 80 to 119. Defendant's score of 89 is the top score in the low average category of 80-89.

In spite of Defendant's mental decline, his interviews indicate that he retains a good vocabulary, and he is able to easily communicate with healthcare professionals about his family history, work experience, and the charges against him. He performed quite well on the ECST-R, the only test he was given that is specifically designed to test legal competence. His descriptions of the trial process and roles of the participants were excellent. There is no evidence that Defendant had actual memory lapses that hindered his ability to participate in the testing or other aspects of these proceedings. He is able to take care of his activities of daily living without any assistance.

Defendant, even with his decline in mental function and mental health issues, presents as far more competent to stand trial than many of the defendants who routinely come before the court. Those other defendants often have very limited education and language skills, have suffered tremendous physical or psychological trauma, and lack Defendant's clear understanding of the charges and legal system. Yet the applicable law provides that even they possess the minimal requirements of legal competency.

The mere fact that a defendant has been diagnosed with a mental disorder or shortcoming does not mean he lacks legal competence. "A defendant can be both mentally ill and competent to stand trial." Mays v. Stephens, 757 F.3d 211, 216 (5th Cir. 2014). This is true even if the mental illness causes delusions. United States v. Garcia-Vargas, 667 Fed. Appx. 491 (5th Cir. 2016) ("Whether Garcia-Vargas was suffering from

delusional disorder is irrelevant, however, if he was both able to understand the nature and consequences of the proceedings and had sufficient present ability to assist counsel in his defense with a reasonable degree of rational understanding."). Mental illness is certainly a factor in the evaluation of a defendant's competence, but it is not dispositive.

Defense counsel likely would not have raised competency were it not for one thing: Defendant's insistence that he did business with Albert Saiah and Alon. The defense argues that Defendant's refusal to admit that Saiah and Alon were a fabrication means, when combined with his diminished capacity, that he must be delusional and, therefore, incompetent. But an alternative explanation is that Defendant knows that his Saiah stories are a pack of lies, and he is refusing to admit it no matter the evidence or the efforts of his own attorneys.

Defendant's experts testified that he suffers from conditions that can cause confabulations or delusions, and Dr. Ouaou opined that Albert Saiah is such a delusion. The undersigned is more persuaded by the testimony of Dr. Browning that this is possible but extremely unlikely. It is particularly unlikely that the only delusions an otherwise functional adult has ever had are those that served the purpose of his complex, multimillion-dollar fraud. And there is no indication that Defendant exhibits similar delusions in other aspects of his life.

A related defense theory is that Defendant perhaps originally invented Albert Saiah as part of a fraudulent scheme, but due to mental decline now actually believes the (false) story he told his really true. When asked about this, Dr. Ouaou said, "It's possible, I would believe; I'm not sure." No witness opined that this is what happened. The undersigned

finds that a preponderance of the credible evidence does not support this theory. Rather, it

shows that it is Defendant's hard-headed obstinacy, not mental health issues, that makes

him continue to insist that Saiah is real.

It is not uncommon for perfectly competent defendants to insist to the court and

counsel that they are completely innocent despite overwhelming evidence to the contrary.

Some of them perhaps think that they will eventually be believed. Others may be unwilling

to face the reality of a conviction and prison sentence that will likely follow their admission.

And some are simply too embarrassed to admit what they did. The latter group includes

many defendants who, like Defendant, have no criminal history and come from relatively

privileged socioeconomic backgrounds. For example, the "little old lady" caught

shoplifting or the businessman arrested for child pornography will often refuse to admit

guilt, even when attempting to enter a guilty plea, despite being caught red-handed or on

video.

A defendant's refusal to admit, even to his own counsel, what appears to be an

undisputable truth does not necessarily mean that he lacks the ability to understand the

legal proceedings and to assist counsel. It more likely means that he is stubborn or

obstinate, but that does not make him incompetent. "A defendant who has it 'within his

voluntary control to ... cooperat[e],' is not incompetent merely because he refuses to

cooperate." United States v. Simpson, 645 F.3d 300, 306 (5th Cir. 2011).

In Simpson, the defendant behaved irrationally and was paranoid, and he refused to

cooperate with two of his lawyers because they called his mental health into question. But

there was also evidence that the defendant demonstrated a flagrant disregard for the mores

of organized society and was attempting to avoid the ultimate consequences of his behavior.  He was found competent.  This case presents a similar scenario.  A case cited earlier, <u>Garcia-Vargas</u>, 667 Fed. Appx. 491, involved a defendant who either suffered from delusional disorder or merely held a strong belief regarding the illegality of the revocation of his lawful-permanent-resident status.  As a district judge observed in that case, the defendant presented not a competency issue but an obstinacy one.

In a case where a defendant was diagnosed with antisocial personality disorder, had prior brain trauma from a car accident, and ranted about government conspiracies, he was nonetheless found competent because "the mere fact that a criminal defendant espouses a far-fetched, or even bizarre, legal-defense theory is insufficient to clear the high hurdle for incompetency."  <u>United States v. Davis</u>, 515 Fed. Appx 486, 493 (6th Cir. 2013).  A defendant has been found competent even when he refused to communicate with counsel because of irrational beliefs.  <u>United States v. Coleman</u>, 871 F.3d 470, 478 (6th Cir. 2017) (defendant professing sovereign citizen beliefs could but refused to communicate with counsel).  Defendant in this case has the ability to communicate with counsel and he has done so; he simply espouses a bizarre defense.  The defense team attributes this to a delusion, but the court finds that the preponderance of the evidence indicates that delusion is not the source of Defendant's insistence on his Saiah stories.

Defense counsel represent in the post-hearing memorandum that the competency issue arose because of their difficulty in communicating with Defendant and investigating the facts as he related them.  The Haney report that debunked the Saiah claims brought home the issue, and they soon filed the motion to determine competency.  Counsel say they

are in a dilemma because the best evidence of Defendant's inability to assist in his defense cannot be presented to the court without running afoul of the attorney-client privilege or the revelation of counsel's mental impressions and theories.  Nevertheless, all counsel represent that they and their investigators and paralegals have read the memorandum and "certify, warrant and represent, as officers of the Court, that we unanimously assert and believe that Mr. deBerardinis is incapable of assisting in his own defense for the reasons laid out herein and based on the communications with and observations of Mr. deBerardinis which are privileged." Doc. 112, pg. 7.

It has been noted that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense."  Medina v. California, 505 U.S. 437, 450 (1992). That said, "[r]epresentations by defense counsel about the defendant's competence may be considered by the court, but they are not determinative of the issue." Wright & Miller, 1A Federal Practice & Procedure Criminal, Determination of Mental Competency, § 209 fn. 51 (5th ed.).  The undersigned has taken account of the representations of the experienced and well respected defense team, but general assurances can only count for so much, particularly where the record includes specific assessments by mental health professionals.

Defendant points to the comments of lay witnesses found in the depositions, phone call recording, and FBI 302 reports.  Some of the witnesses described Defendant as difficult to understand or even sounding crazy.  But his comments in the quoted email and the recorded phone call with the Webbs might also demonstrate that he is a fast-talking con man who could baffle his victims with jargon.  To the extent the witness comments tend to

indicate Defendant was crazy, they equally suggest he was crazy like a fox. Much of what he wrote and said is similar to the sort of important-sounding but ultimately empty talk often heard from politicians and persons who pitch investment opportunities. Given the ambiguities, this evidence is of limited weight.

In the end, "[r]equiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran, 509 U.S. 389, 402 (1993). After considering all of the evidence and arguments, the undersigned is firmly convinced that more than a preponderance of the evidence demonstrates that Defendant—despite his limitations—has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, and he has a rational as well as factual understanding of the proceedings against him. He may be stubborn or persistent about certain facts or his theory of the case, and he may frustrate his lawyers, but he is not incompetent. Accordingly;

It is recommended that the court enter a finding that Defendant is legally competent to stand trial.[2]

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **twenty-one (21) days** from the date of this

---

[2] Counsel for the United States and Defendant did an excellent job of marshalling the evidence, examining the witnesses, and arguing their competing interpretations of the evidence. All of the expert witnesses were well prepared and did a good job of explaining complex matters in a helpful way. They are all commended for their professionalism.

report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **seven (7) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 3rd day of April 2020.

Mark L. Hornsby
U.S. Magistrate Judge