UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 18-cr-00030-01 |
| VERSUS | CHIEF JUDGE HICKS |
| DAVID D. DEBERARDINIS (01) | MAGISTRATE JUDGE HORNSBY |

### REPORT AND RECOMMENDATION

**Introduction**

David D. deBerardinis ("Defendant") was indicted in connection with allegations that he defrauded sophisticated investors of millions of dollars that they invested in a fuel trading business. The charges arise out of an alleged Ponzi scheme, orchestrated by Defendant, to defraud investors and two federally insured banks. Defendant led investors to believe that his company, Financial Resources ("FR"), was able to buy fuel from Alon, USA, Inc. ("Alon"), an Israeli company, and then resell the fuel to Freeport-McMoran and FedEx at higher prices.

Defendant represented that he had a personal, but highly confidential, relationship with certain principals at Alon, namely Albert Saiah, which allowed him to earn a virtually guaranteed profit from the fuel trading arrangement. Albert Saiah, however, does not exist. The fraud was exposed, and Defendant's investors lost millions of dollars.

Before the court is the Government's **Motion to Vitiate Attorney-Client and Work Product Privileges. Doc. 159**. The Government argues that (1) the crime-fraud exception to the attorney-client and work product privileges (sometimes collectively

referred to as "the privileges") applies to Defendant and his attorneys, Jerald R. Harper ("Harper), Walter J. Stanton ("Stanton"), and W. Alan Pesnell ("Pesnell"), related to several fraudulent transactions; and (2) the court should hold an *in camera* review of the entire relationship between the attorneys and Defendant to determine the scope of the crime-fraud exception's applicability.

For the reasons the follow, it is recommended that the Government's motion be granted in part and denied in part. More specifically, the privileges should be vitiated as to three specific fraudulent transactions described herein, but the Government's request to explore a broader vitiation during an *in camera* review should be denied.

**Factual Background**

By at least December 15, 2009, Defendant purportedly entered into a master fuel purchase agreement with Alon. Govt. Ex. 1 (Exhibits to Doc. 159). The letter agreement was signed by representatives of Alon, including Albert Saiah. Defendant signed as owner of FR. The fuel sales agreements between Defendant (and FR) and Freeport-McMoran (June 14, 2013) and FedEx (February 11, 2014) are Government Exhibits 2 and 3. Defendant insisted that his relationship with Saiah was strictly confidential, which led to the failure to obtain a $50 million loan from another investor group, as explained later, due to the putative lender's inability to meet with or speak to anyone on a land line to confirm details. Govt. Ex. 18.

In furtherance of his fraudulent scheme, Defendant asked Eric Triche ("Triche"), his computer services provider, to create fake email accounts for Alon executives. Govt.

Ex. 4. Defendant used the fake emails to further his scheme. Govt. Ex. 5. The Government shows that Triche or someone else also created fake stationery for Alon. Govt. Ex. 16.

There are four fraudulent transactions discussed in the Government's motion and brief:

- $17.5 million loan from PlainsCapital Bank ("PlainsCapital")
- $29.5 million amended loan from PlainsCapital Bank
- Attempted $50 million loan from MGG Investment Group ("MGG")
- $2.5 million loan from Raymond Stafford ("Stafford") of Dublin, Ireland.

### A.  PlainsCapital Loan and Amended Loan

For some time prior to July 2016, Attorney Pesnell represented Defendant and his FR entities. He also served as secretary for FR III. Govt. Ex. 6. In 2014, Pesnell represented Defendant and FR in obtaining a $17.5 million loan from PlainsCapital. Govt. Ex. 7 (November 10, 2014 email from Pesnell to attorneys for PlainsCapital). Pesnell prepared and reviewed fraudulent Alon documents in connection with the $17.5 million loan and the amended $29.5 million loan. Govt. Exs. 14 & 15. These documents represented to PlainsCapital that Alon would guarantee the loan in the event of Defendant's default.

Pesnell's signature and notary seal appear on one draft of the fraudulent documents. Govt. Exs. 8 & 9. The Government represents that Pesnell said that he never included his signature and seal on the letter and promissory note, but the undersigned has not seen written confirmation of Pesnell's statement. In 2015, Defendant sought to increase the

PlansCapital Loan to $29.5 million. However, Pesnell withdrew as counsel for Defendant and as secretary for FR before the amended loan closed. Govt. Ex. 10.

Attorney Stanton served as general counsel and secretary for various FR entities from approximately 2011 to July 2016. Govt. Ex. 11 (email from Stanton to Defendant and two others on Defendant's management team, Todd Muslow and Neil Umhafer, regarding possible funding). Stanton was included on email communications from persons he believed were Alon executives. Govt. Ex. 11 & 12. Stanton also prepared and reviewed fraudulent Alon documents in connection with the $17.5 million and the $29.5 million loans from PlainsCapital. Govt. Exs. 14 & 15.[1]

### B. Attempted $50 Million Loan from MGG

Stanton also represented Defendant in attempting to secure a $50 million loan from MGG to fund operations under the fuel trading agreements. Govt. Ex. 3. Stanton prepared documents for the lending agreement. Govt. Ex. 17. But MGG refused to go forward because MGG was not permitted to meet in person or initiate calls with Alon executives; instead, all communication was originated by Defendant using three way calling or the like. Govt. Ex. 18. As Exhibit 18 shows, MGG was also concerned about whether Stanton's personal stake in the transaction was a conflict of interest that biased his opinions. Id.

---

[1] The December 15, 2000 agreement between Defendant and Alon USA (Govt. Ex. 1) was purported to be signed by James Ranspot, corporate counsel for Alon. But the real James Ranspot confirmed in his sworn depositon testimony that the Alon letterhead and signatures on the documents were not genuine. Govt. Ex. 16.

### C.  $2.5 Million Loan from Stafford

Both Stanton and Harper provided representation to Defendant in connection with the $2.5 million loan from Stafford.  Harper started work for Defendant in June 2015.  Govt. Ex. 19 (email from Defendant to Harper regarding serving as Defendant's Louisiana attorney; the email further states that Defendant will "probably hire Bracewell and Guiliani (sic) for his national council (sic).").  See also Government Ex. 20 (Defendant providing Harper with records, audits, financial, contracts, and trade documents).  Harper was included on fake emails from Defendant to Alon's general counsel, James Ranspot, from an email account that was set up by Triche for Defendant.  Govt. Ex. 12.

Harper represented Defendant and FR in the loan transaction.  He drafted a promissory note, a guaranty agreement from Alon to Stafford, and a resolution for FR authorizing Defendant to execute documents to obtain $10 million in bridge loans.  Govt. Exs. 21 & 22.  Stanton, on the other hand, represented FR IV in coordinating the documentation from Alon.  Govt. Ex. 21 (email from Stanton).  Harper and Stanton worked together to draft a letter related to a Master Trading Account ("MTA") between Defendant and Alon.  Id.

Stafford needed assurance that Defendant and FR had the funds necessary to repay the $2.5 million loan, and Harper told Stafford's attorney that the MTA (maintained by Alon) is in book entry form only.  Harper told the attorney that no statements were issued to Defendant or FR to confirm the balance in the account.  Govt. Ex. 25 (email from Stafford's attorney to Harper confirming phone call).

Harper and Stanton prepared the acknowledgement letter for Stafford. The letter was placed (by someone) on fake Alon stationery and executed by Defendant and Shai Even, Senior Vice President and CFO of Alon. The letter informed Stafford that Defendant and FR had a trading account relating to fuel purchase and sales, and that the account had a balance of $29 million. Govt. Exs. 21, 22, and 27. The signature of Alon's CFO was a forgery.

Stafford executed the documents, and on March 17, 2016, he authorized a wire transfer of $2.5 million. Govt. Exs. 27 & 29. The loan became due on May 16, 2016, but Stafford was not repaid. When Stafford's attorneys contacted Alon regarding the guaranty, Alon's general counsel James Ranspot (the *real* James Ranspot) wrote back and said Alon was not a party to any of the agreements and that the guaranty agreement "is likely a fraudulently executed document." Govt. Ex. 30.

**Law and Analysis**

The Government argues that the crime-fraud exception to the attorney-client and work product privileges applies to the above fraudulent transactions. The Government also asks that the court go even further: The Government asks the court to conduct an *in camera* review of each of the attorney-client relationships to determine the scope of the vitiation, i.e., whether Defendant used the attorney-client relationships "for the sole purpose of furthering the charged fraud scheme."

   **A. The Crime-Fraud Exception**

"Under the crime-fraud exception to the attorney-client and work product privileges, the privilege can be overcome where communication or work product is intended to further

continuing or future criminal or fraudulent activity." In re Grand Jury Subpoena, 419 F.3d 329, 335 (5th Cir. 2005). In order to invoke the crime-fraud exception, the party seeking to breach the walls of privilege must make out a prima facie case. Id. "To make the necessary prima facie showing for the application of the crime-fraud exception, the Government must produce evidence 'such as will suffice until contradicted and overcome by other evidence… a case which has proceeded upon sufficient proof to that stage where it will support a finding if evidence to the contrary is disregarded.'" Id. at 337.

After the party seeking disclosure meets its prima facie showing that the client intended to further an ongoing crime or fraud during the attorney-client relationship such that the crime-fraud exception applies, the only attorney-client communications and work product materials falling within the scope of the crime-fraud exception are those shown to hold some valid relationship to the prima facie violation such that they reasonably relate to the fraudulent or criminal activity. In re Grand Jury Subpoena, 419 F.3d at 346; Waste Mgmt. of Louisiana, LLC v. River Birch, Inc., 2020 WL 3001301, at *2 (E.D. La. 2020).

### B. The Government's Prima Facie Case

The undersigned finds that the Government has proved by a prima facie showing that the crime-fraud exception applies to the two fraudulent PlainsCapital loans (the $17.5 million loan and the amended $29.5 million loan) and the $2.5 million loan from Raymond Stafford.[2] The evidence shows that Defendant created and used fake email addresses for

---

[2] The Government did not provide enough evidence of the details regarding the attorneys' representation of Defendant during the failed $50 million loan from MGG. Therefore, the crime-fraud exception should not apply to that attempted loan.

Alon, created and used fake stationery for Alon, and with the help of Pesnell, Harper, and Stanton, drafted a fake promissory note, guaranty agreement, and other documents bearing the forged signatures of Alon's executives. Defendant did all this while maintaining that his deal with Alon (and Saiah) was so confidential that no part of it could be disclosed. He did so clearly to stop the prying eyes of investors and lenders from looking too close at the details.

### 1. PlainsCapital Loans

Defendant successfully led PlainsCapital to believe that its loans to Defendant were secured by Alon, a transnational fuel company. Govt. Exs. 8 & 9. But it was all a fraud. Defendant had no relationship whatsoever with Alon. Govt. Ex. 16.

Defendant used Pesnell and Stanton for the purpose of fraudulently obtaining the loans from PlainsCapital. While Pesnell and Stanton were unwitting participants, they frequently communicated with Defendant, each other, and PlainsCapital's attorneys to complete the transaction. Govt. Exs. 6, 7, 8, 9, 14, 15, & 21.

### 2. Raymond Stafford Loan

Defendant used Harper's and Stanton's services to successfully defraud Stafford out of $2.5 million. Harper helped Defendant with the promissory note, the guaranty agreement, and a FR resolution authorizing Defendant to execute documents to obtain $10 million in bridge loans. Govt. Exs. 21-23. Emails show Harper asked Stanton and Todd Muslow how to provide Stafford with a representation that Defendant could repay the loan. Govt. Ex. 24. Harper represented that there were no documents to confirm the account

balance of the MTA. Stanton assisted on the Stafford loan by preparing and reviewing fraudulent Alon documents. Govt. Exs. 14, 15, & 21.[3]

### C. The Scope of the Vitiation of the Privileges

It is not as though some aspects of what Pesnell and Stanton unwittingly did with regard to the PlainsCapital loans and what Harper and Stanton unwittingly did with regard to the Stafford loan were in furtherance of some lawful business practice; *the entire endeavor as to the PlainsCapital loans and the Stafford loans were completely fraudulent*. Pesnell, Harper, and Stanton assisted Defendant in pulling off a cleverly executed deception. Pesnell, Harper, and Stanton just didn't know it. Therefore, under the crime-fraud exception, neither the attorney-client privilege nor the work product privilege applies to *any* of the documents or communications in furtherance of the two PlainsCapital transactions and the Stafford transaction.

Of course, the undersigned does not intend for the crime-fraud exception to apply to any further communications or documents once Defendant's fraud was exposed and the jig was up. At that point, any further representation by Harper or Stanton would have been in anticipation and/or defense of civil and criminal litigation.[4]

### D. Defendant's Arguments

Defendant argues, among other things, that the Government's motion to vitiate is procedurally defective because no subpoena has yet been issued. It is true that most

---

[3] In a civil case filed by Stafford against Stanton, the undersigned has already found that the crime-fraud exception applied to Stanton's work for Defendant on the Stafford loan. 2019 WL 3821809 (W.D. La. 2019).
[4] Pesnell stopped representing Defendant in June 2015. Govt. Ex. 10.

arguments regarding the privileges are in response to subpoenas or other discovery devices. But the undersigned finds no error in the Government bringing this issue to the court well before the scheduled trial. Had the Government waited until trial subpoenas were issued and motions to quash were filed, these issues would have very likely led to additional delays in the trial schedule.

Defendant argues that the Government's motion is defective because Pesnell and Stanton have not been given notice of the motion and an opportunity to object. However, they will have sufficient time to appear and file any objections to this Report and Recommendation before Chief Judge Hicks acts on it. The Government shall ensure that Pesnell and Stanton receive notice of this opinion, which includes a 14-day deadline for filing objections.

Defendant also argues that a hearing should be held on this motion. The Government stated that it welcomes a hearing because it wants to present evidence to vitiate the entirety of the attorney-client privileges during the period of time charged in the indictment. But a hearing of that nature and an *in camera* review of the potential universe of documents would be an ordeal lasting several weeks. The undersigned believes the evidence the Government submitted with its motion makes a prima facie case with regard to the two PlainsCapital loans and the one Stafford loan. The exhibits the undersigned has studied in connection with this motion are sufficient. And because all of the work performed by the attorneys in furtherance of the three fraudulent transactions falls within the crime-fraud exception, no hearing is required to further develop the scope of the vitiation.

Defendant also argues that the Government's motion seeks irrelevant and/or cumulative information from Harper. The undersigned rejects this notion altogether. While other attorneys may have performed "peripheral work" for Defendant, the Government's evidence shows that Harper's work on the Stafford loan was substantial and important to the closing of the loan. And with regard to the witness-advocate argument, the undersigned has recently issued a Report and Recommendation that Harper be disqualified from acting as trial counsel for Defendant in this case.

Finally, Defendant argues, almost in passing, that it was mainly "certain members of [his] management team, and not [Defendant], who were likely engaged in a fraudulent scheme, if one did occur at all." Doc. 178, p. 3. Defendant did not expound any further on that claim in his eight-page opposition, and he attached no exhibits to cast any doubt on the information that establishes the Government's prima facie case.

**Conclusion**

Based on the foregoing, the undersigned finds that the Government has presented a prima facie case for the application of the crime-fraud exception to the two PlainsCaptial loans and the one Stafford loan. Neither the attorney-client privilege nor the work product privilege should apply to *any* of the documents or communications in furtherance of the two PlainsCapital transactions and the Stafford transaction.

Accordingly,

It is recommended that the motion be granted in part and the court find that the Government has presented a prima facie case for the application of the crime-fraud exception to the two PlainsCaptial loans and the one Stafford loan. Therefore, neither the attorney-client privilege nor the work product privilege should apply to *any* of the documents or communications in furtherance of those three transactions.

It is further recommended that, except as granted above, all other requests by the Government in the motion be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 1st day of February, 2021.

Mark L. Hornsby
U.S. Magistrate Judge